## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Adalberto Garcia, being sworn, state:

### Introduction and Agent Background

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed for approximately four years. I graduated from the DEA Special Agent Academy in 2019. Prior to that, I was employed as a Police Officer with the Nashua, New Hampshire Police Department for over eleven years. For approximately four years, I was assigned to the Detective Bureau. For three of those years, I was assigned to the Nashua Police Department Drug Unit. While working in the drug unit, I was primarily assigned to the DEA High Intensity Drug Trafficking Area Task Force in the Manchester, New Hampshire District Office ("MDO"), where I was deputized as a DEA Task Force Officer. Since becoming a Special Agent with DEA, I have been assigned to the DEA Cross Border Initiative Task Force ("CBI") located in Massachusetts. In addition to the DEA academy, I have attended narcotic and criminal investigation training classes put on by the New Hampshire Police Standards and Training Council, the DEA, and the Nashua Police Department. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §841(a)(1).

3. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents and cooperating sources, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics

trafficking organizations. I am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4. By virtue of my employment as a police officer and assignment as a DEA Special Agent, I have performed and continue to perform various duties, including, but not limited to: working in the capacity of a surveillance agent detecting and recording movement of persons known to be or suspected of being involved in illegal drug trafficking; working as a case agent directing the investigation of various illegal drug traffickers and their organizations; and directing investigations involving complex conspiracies.

5. Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity. I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers. I understand illegal drug trafficking often involves the local, interstate, and international movement of illegal drugs to distributors and co- conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors and money launderers.

6. I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for,

transport, and launder drug proceeds. I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, communication apps, and other means to facilitate their illegal activities.

7. Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones. Through my training and experience, I have acquired specialized knowledge in the activities of drug traffickers, including their use of residences, businesses, and drug "stash houses" to store and process drugs for distribution and to direct their drug distribution activities. That training and experience has led me to believe that drug traffickers store contraband, as well as other evidence of their crimes such as drug proceeds, cellular telephones, and cuff sheets or owe sheets, at their residences, businesses, and stash houses.

**Purpose of Affidavit**

8. Since at least as early as January 2023, the DEA has been investigating Angel Joel Diaz ("DIAZ"), a/k/a Guero for conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846 and for distribution and possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1).

9. I submit this affidavit in support of an application for a criminal complaint charging DIAZ with distribution of and possession with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A)(vi) (the "Target Offense").

10. Based on the facts set forth in this affidavit, there is probable cause to believe that DIAZ has committed the Target Offense.

11. I have personally participated in this investigation since January 2023. The facts in this affidavit come from my personal observations, my training and experience, surveillance, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter, but only the facts that I believe are necessary to establish the foundation for the warrant. All times set forth herein are approximate.

## Probable Cause

12. Since approximately January 2023, investigators from the DEA have been investigating DIAZ. In January 2023, investigators received information that an individual known as "Guero," later identified as DIAZ, is a fentanyl pill distributor around Lawrence, Massachusetts. Investigators also received a telephone number for DIAZ, (857) 335-0142 (the "0142 phone"), and a screenshot of a social media profile for "Joel Diaz." A Spanish-speaking undercover officer (the "UC") agreed to contact DIAZ to arrange controlled purchases of fentanyl.

**Controlled Purchase of 100 Fentanyl Pills and 100 Methamphetamine Pills on January 11, 2023; Identification of DIAZ**

13. On January 10, 2023, the UC placed a recorded call to DIAZ at the 0142 phone via the encrypted platform WhatsApp.[1] The two agreed to meet in Lawrence the next day, January 11, 2023, at 1:00 p.m.

14. The following day, January 11, DIAZ and the UC agreed to meet that afternoon at 60 Salem Street in Lawrence, which is a residential area next to a park. The UC said he wanted to

---

[1] The communications described in this Affidavit were in Spanish and were recorded/preserved. DIAZ employs a WhatsApp setting that makes some communications disappear after 24 hours.

buy "100," meaning 100 fentanyl pills, to see if the quality is good. DIAZ agreed and confirmed the price was $1 per pill.

15. DIAZ arrived at the meet location in a green Honda CRV (the "green Honda") at approximately 1:29 p.m. and parked directly behind the UC's vehicle. Investigators saw a male driver and a female passenger. Investigators queried the registration information for the green Honda and saw it was registered to O. A.,[2] 562 Main St., Apt. 1, Haverhill, Massachusetts 01830. Investigators consulted Haverhill Police and learned that the green Honda had been pulled over for traffic violations on December 29, 2022. During the stop O. A. was in the passenger seat. The driver was identified as a male named Angel Joel Diaz, which is the name ("Joel Diaz") used in the social media profile that investigators received as described earlier. DIAZ lacked a driver's license; he and O. A. were summonsed for motor vehicle violations. The photograph associated with the booking report for this incident matched the person who arrived at 60 Salem Street in the green Honda. The UC later confirmed this is the person he met with.

16. DIAZ got out of the green Honda and entered the UC's car. The UC's interaction with DIAZ was audio and video recorded. DIAZ handed two sealed packages of blue pills to the UC. DIAZ said the first package contained smaller pills that "run" in Boston and Providence. DIAZ stated he had recently sold 20,000 of those. DIAZ said the second package, which had darker blue pills, were larger pills that people in Lawrence prefer. DIAZ said he was giving one package to the UC as a sample and that it contained "100." DIAZ confirmed he was giving the UC 200 pills in total.

---

[2] I am aware of the true name of this person but am omitting it here because the person is not being charged in this Complaint.

5

17. During further conversation, DIAZ stated that he sells the pills for $1 per pill to those who buy 1,000 pills or more including to those who buy as many as 20,000 pills. DIAZ stated that the pills are made with "fentanyl" and that he sometimes receives kilograms from the "Mexicans." DIAZ said he sometimes makes his own pills. DIAZ said the larger pills are 6.5 millimeters and he sells them to people in Lawrence for $1.50 per pill and to people in Boston for $3 per pill.

18. DIAZ described other types of pills that he sells and told the UC he would go back to his car to get his phone to show the UC pictures. DIAZ went back to his car and then returned to the UC's car. DIAZ showed the UC pictures of pills on DIAZ's phone, including blue pills that DIAZ said he made himself and would sell to the UC at $2 per pill.

19. DIAZ said he had sent pills to New York and those pills were knocking people down. In my training and experience, DIAZ was referring to his pills being strong and potentially causing people to overdose. DIAZ said he can ship pills to New York via Federal Express or UPS, and that he would do so by using fake names and phone numbers.

20. DIAZ returned to the green Honda and drove away. Investigators followed the green Honda to its registered address of 562 Main Street, Haverhill.

21. Analysis at a DEA laboratory revealed that one pack of pills (107 count) contained fentanyl and weighed 11.713 grams. The other pack of pills (101 count) contained fentanyl and methamphetamine and weighed 14.282 grams.

**Controlled Purchase of 5,150 Suspected Fentanyl Pills from DIAZ on January 27, 2023**

22. Following the buy, DIAZ continued to use the 0142 phone to communicate with the UC. The UC and DIAZ discussed a plan for the UC to return to Boston in two weeks and buy another 5,000 pills ("5") from DIAZ. On January 13, 2023, DIAZ sent the UC a photograph of

6

two tin pans in an oven with a blue substance in them. DIAZ said he was going to make the small ones for the UC and they would look similar to the "original," which in my training and experience means DIAZ would make the UC the smaller pills that he sold the UC on January 11, 2023, and that were found to contain fentanyl.

23. On January 15, 2023, DIAZ sent the UC a picture of a wrapped brick of apparent narcotics and asked the UC if he wanted it. The two discussed a plan for the UC to buy the brick from DIAZ at a later date for $27,000. Based on my training, experience, and familiarity with this investigation, I believe the photograph of the brick that DIAZ sent is approximately one kilogram of a substance containing fentanyl.

24. On January 18, 2023, DIAZ sent the UC a picture of blue pills stamped "M/30." DIAZ stated in an audio message to the UC, "That's the one that I'm going to make brother, those same one." The two continued to discuss the UC's upcoming purchase of 5,000 pills from DIAZ.

25. On January 27, 2023, the UC and DIAZ spoke by phone. The UC said he was in the area to pick up the "5." The UC and DIAZ agreed to meet at the same location as the prior deal (60 Salem St., Lawrence) later that day at 2:00 p.m.

26. Law enforcement watching 562 Main Street watched DIAZ exit the building and enter a red Jeep registered to O. A. Investigators followed the red Jeep, which DIAZ drove directly to the meet location with a front-seat passenger believed to be O. A. and a small child in the back.

27. At approximately 3:57 p.m., DIAZ exited the Jeep with a white bag and entered the UC's vehicle. The interaction was audio- and video-recorded. Once inside, DIAZ handed the UC a white CVS bag. Inside the bag, the UC could see what appeared to be thousands of light-blue pills consistent with the light-blue pills the UC purchased from DIAZ on January 11. The UC asked if the bag contained "5,000," meaning pills, and DIAZ stated that it contained "5,150." The

7

UC handed DIAZ $5,000 in official funds. While in the car, DIAZ told the UC that when the UC called, DIAZ immediately started making "them" for the UC and that he had to hurry to make them.

28. Investigators conducted a field test of the pills received from DIAZ. The test was positive for acetaminophen and could not rule out the presence of narcotics. In my training and experience, drug traffickers commonly mix fentanyl with other substances, particularly when making pills, which can result in an inconclusive field test but a positive lab result for fentanyl. Based on my training and experience, as well as my familiarity with this investigation, including the appearance of these pills, the price paid for them, and the prior positive result for fentanyl following the January 11 controlled purchase, I believe that the pills the UC received from DIAZ on January 27 contain fentanyl.

**Controlled Purchase of 8,500 Suspected Fentanyl Pills from DIAZ on February 7, 2023**

29. On February 7, 2023, at approximately 10:29 a.m., the UC and DIAZ spoke via WhatsApp. The UC said that he was again in town and wanted to buy "8,000." DIAZ said he would start "making them now." DIAZ stated he was going to include 500 pills as a "gift" to the UC. At approximately 3:07 p.m., DIAZ texted the UC that he was "packaging them to go over there," which the UC understood to mean DIAZ was packaging up the pills and preparing to go to the usual meet location (60 Salem St., Lawrence).

30. At approximately 3:55 p.m., the UC saw DIAZ driving the green Honda with O. A. in the front passenger seat. DIAZ parked, exited, and got into the UC's vehicle carrying a shopping bag. The interaction was audio- and video-recorded. DIAZ put the bag on the center console; when the UC opened it, he could see what appeared to be thousands of light-blue pills consistent

in appearance with the light-blue pills the UC bought from DIAZ on January 11 and on January 27. DIAZ said there were "8,500" inside, with 500 being a "gift." The UC handed DIAZ a brown paper bag containing $8,000 in official funds.

31. Investigators conducted a field test of the pills received from DIAZ. The test was positive for acetaminophen and could not rule out the presence of narcotics. In my training and experience, drug traffickers commonly mix fentanyl with other substances, particularly when making pills, which can result in an inconclusive field test but a positive lab result for fentanyl. Based on my training and experience, as well as my familiarity with this investigation, including the appearance of these pills, the price paid for them, and the prior positive result for fentanyl following the January 11 controlled purchase, I believe that the pills the UC received from DIAZ on February 7 contain fentanyl.

32. While DIAZ was in the UC's car, the UC asked if DIAZ could get the UC a "whole one," meaning a kilogram of fentanyl. DIAZ said yes. The UC asked if the UC could pay for half of the whole one the next time they met, and DIAZ said yes. DIAZ said he would look into the pricing for the UC.

33. Following the buy, investigators followed DIAZ and O. A. in the green Honda first to a restaurant and then to 562 Main St., Haverhill.

**Execution of Search Warrant at 562 Haverhill St., First Floor, on February 15, 2023, and Seizure of a Pill Press, 31,800 Suspected Fentanyl Pills, and Thousands More Pills**

34. Following the controlled buy on February 7, 2023, the UC and DIAZ discussed a plan for the UC to purchase more pills from DIAZ on February 15, 2023. On February 14, 2023, DIAZ sent a photograph of pills to the UC. DIAZ stated that making the pills was almost enough

to "knock" someone, and that "even making it with a mask it makes you vomit and everything." DIAZ told the UC he would bring 30,000 pills to the meet on February 15.

35. On February 14, 2023, the Hon. Paul G. Levenson, U.S. Magistrate Judge, District of Massachusetts, signed a warrant authorizing a search of the first floor of 562 Main Street, Haverhill, Massachusetts, which investigators had identified as DIAZ's and O. A.'s residence.

36. On the morning of February 15, DIAZ told the UC that he was adding 1,800 pills of the "first one that you took in the separate bag." The UC understood this to mean that in addition to the 30,000 light-blue pills he sold to the UC on January 11, January 27 and February 7, DIAZ was bringing 1,800 of the darker-blue pills that he sold to the UC on January 11, 2023. DIAZ further told the UC that he "sealed it in a box."

37. Around noon, investigators saw DIAZ and O. A. leave 562 Main Street with DIAZ carrying a shopping bag. DIAZ put the bag into the red Jeep registered to O. A. Investigators announced themselves as law enforcement and detained DIAZ pending execution of the search warrant. DIAZ provided written consent to search the shopping bag that was in the Jeep. Inside the shopping bag investigators found a large number of light blue pills in six plastic bags consistent with being 30,000 of the light blue pills DIAZ sold to the UC on January 11, January 27 and February 7, and a seventh plastic bag consistent with being 1,800 of the dark-blue pills that DIAZ sold to the UC on January 11, 2023.

38. Investigators executing the search warrant knocked on the door of the first-floor unit for 562 Main Street and announced their presence. After receiving no response, investigators breached the door. Shortly thereafter an adolescent child, and then a smaller child, appeared. The

two children exited at officers' command. In a room to the right investigators encountered the elderly man who was bed-ridden and appeared to be immobile.

39.  Inside a bedroom just beyond the living room investigators found an industrial pill press covered with a black trash bag. The press had powder residue on it. The press was taken outside, uncovered, and is depicted below.



40.  On a table in the bedroom was a backpack with dye (stamps) that fit into a pill press, as well as thousands of pills of various colors and loose powder of various colors. Several masks were on the same table. The bedroom table is depicted below.



41.     In the washer/dryer area near the kitchen, investigators found a bag containing a plastic peppermint-candy container that had blue powder filled to the top.  Inside this same bag investigators also found various chemicals that are typically used to manufacture pills.

42.     In the bathroom investigators found approximately 5,000 blue pills in a heat-sealed bag consistent in size and appearance with blue pills DIAZ previously sold to the UC.  The

bathroom also contained a chunk of rock-like substance consistent in my training and experience with being a piece of a brick of fentanyl.

43. Above the refrigerator investigators found another tub of blue powder and a shopping bag with white powder in it.

44. A photograph of pills and powder that were found at 562 Main St., and in the Jeep, is below.



45. Investigators obtained written consent from DIAZ to search the garage. In the garage, investigators found another pill press and a press designed for pressing powder into brick form. A picture of the second pill press appears below.



## Conclusion

46. Based on the information contained in this affidavit, there is probable cause to believe that Angel Joel DIAZ committed the Target Offense, i.e., distributed and possessed with

intent to distribute 400 grams or more of fentanyl, in violations of 21 U.S.C. § 841(a)(1) & (b)(1)(A)(vi).

*Adalberto Garcia /by Paul G. Levenson*
_____
Adalberto Garcia
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me via telephone in accordance with Fed. R. Crim. P. 4.1 on this 15th day of February 2023.

_____
HONORABLE PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE